IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


BENJAMIN WILLIAM FAWLEY,

        Plaintiff,

v.                                              CIV 11-0181 LH/KBM

GEO GROUP, INC., GREGG MARCANTEL,
in his official capacity as Secretary for the New Mexico
Department of Corrections,  DWAYNE BURRIS,
Correctional Officer, and FNU WIGGINS,
Correctional Officer.

        Defendants.


# PROPOSED FINDINGS
## AND
## RECOMMENDED DISPOSITION

      THIS MATTER is before the Court on Defendants' Joint *Martinez* Report,

*Bounds/Lewis* Supplement, *see Docs. 63, 70,* Plaintiff's responses to the same, *see*

*Docs. 71-72,* and Defendants' reply, *see Doc. 73.*  Plaintiff has also filed a number of

other motions, only two of which predated the Court's briefing schedule.  *See Docs. 57,*

*58, 68.*  Some of these motions reiterate, or elaborate on, Plaintiff's arguments in

support of his claims, some of raise new matters, and some received a response from

Defendants.  *See Docs. 69, 75, 76, 79. 80, 81, 84.*

      For the reasons below, the Court recommends that all pending motions be

denied, filing restrictions be imposed if Plaintiff fails to abide by requirements mentioned

herein, summary judgment enter in favor of Defendants, and this action be dismissed

with prejudice.

# I.  General Factual & Procedural Background

After his *Alford* Plea to murder in second degree, Plaintiff was sentenced in 2006 to forty years incarceration in the Virginia Department of Corrections.  *See, e.g., Doc. 11* at 5-6.  Virginia transferred him to New Mexico under the Interstate Corrections Compact ("ICC") in March 2009.  *See Doc. 63* at 1-2; *see also Fawley v. Johnson, et al.,* Civil Action No. 7:09–cv–0041, 2011 WL 3240537, at *3 (W.D. Va. Jul. 28, 2011), *aff'd,* 466 F. App'x 187 (4th Cir. 2012); *Fawley v. Williams,* CIV 11-0061 BB-CG (Doc. 35 at 5-6).  In May 2009, he was transferred again but remained in New Mexico.  *See Doc. 63* at 2.

Plaintiff has filed many lawsuits, most of which are available on PACER.  A West Virginia case discusses Plaintiff's state post-conviction proceedings.  *See Fawley v. Johnson, et al.,* Civil Action No. 7:09–cv–0041, 2011 WL 3240537, at **1-2 (W.D. Va. Jul. 28, 2011), *aff'd,* 466 F. App'x 187 (4th Cir. 2012); *see also Fawley v. Janecka,* CIV 0900892 WJ/RHS (Doc. 20).  The Court takes take judicial notice of these prior suits, because they have bearing on the instant case.  The analysis sections of this opinion discuss them in more detail.  *See, e.g., St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.,* 605 F.2d 1169, 1172 (10th Cir. 1979); *Fawley v. Williams,* CIV 11-0061 BB-CG (Doc. 35 at 6, n.2); *Doc. 63* at 2.

The instant matter is Plaintiff's second suit in this District where his primary complaint is that New Mexico's policies on legal materials and photocopying deny him access to the courts.

# II.  Initial Considerations

## A.  Note On Different Versions Of Policies

The Department revised its legal access and photocopying policies on the same

dates – July 30, 2008, June 24, 2009, May 26, 2010, April 27, 2011 and March 30,

2012.  The Court is aware of these amendments because the earlier versions were

submitted with the *Martinez* Report in the earlier suit, and two latest versions were

submitted with the *Martinez* Report in this case.   *See Doc. 63-3* at 4-24; *Doc. 63-4* at 1-

40; *Fawley v. Williams, et al.,* CIV 11-0061 BB/CG (Docs. 34-5 through 34-10); *see also*

*Doc. 26* at 19-21 (flyer noting policy change effective May 9, 2011).  Some of the events

in late 2012 in this case predate the latest two versions, however, the regulations

discussed below have remained unchanged from early 2010 through 2012.

## B.  Note On "Denial" Of Documents 22 And 26 Submitted By Plaintiff

In Documents 22 and 26, Plaintiff attached materials ranging from his requests

for copies, responses to grievances, and his submissions and correspondence with

Virginia courts.  In the Court order that allows Plaintiff to proceed with original and

amended claims in this suit past the screening stage, Judge Hansen "denied" Plaintiff's

attempt to file those two documents, but qualifiedly did so.  Defendants rely on the

documents Plaintiff submitted and so does the Court.[1]

---

[1] For example, Judge Hansen denied Plaintiff's Document 26 without prejudice "pending
consideration of Defendants' answers and a possible *Martinez* report."  *Doc. 27* at 5.
Nevertheless, the *Martinez* Report recognizes the claim raised in this document concerning the
mandamus petition to the Virginia Supreme Court.  *Doc. 63* at 17.  In addition, Judge Hansen
denied as "moot," Plaintiff's submission that attached, among other things, the two letters he
received from the Supreme Court.  *See Doc. 27* at 5 (denying *Doc. 22*).  Nevertheless, the body
of the order specifically mentions that Plaintiff's Complaint alleges the "policies have forced
Plaintiff to submit noncomplying document**s** for filing at the Supreme Court, which document**s**
have been returned to him without being filed."  *Id.* at 27 at 2 (emphasis added).  Thus, he
plainly was allowing the Supreme Court claim to go forward, and knew it involved multiple

### C.  Res Judicata Inapplicable

Plaintiff filed the first such action on January 18, 2011, and it has since concluded.  *See Fawley v. Williams,* CIV 11-0061 BB-CG (Doc. 1).  Defendants refer to Judge Black's case as the "Ancillary Case."  *See, e.g., Doc. 63* at 2.  Plaintiff filed the instant action on February 22, 2011.  *See Doc. 1.*

In Judge Black's case, Plaintiff challenged how the policies allegedly impacted two proceedings in Virginia:  (1) state appellate proceedings after the denial of one of his state habeas petitions and; and (2) his § 1983 suit in Western District of Virginia challenging the Virginia Department of Corrections' legal access policy.  *See Fawley v. Williams, et al.,* CIV 11-0061 BB-CG (Doc. 35 at 5-7).  Judge Black dismissed Plaintiff's first suit failure to establish an "actual injury" in his attempts to litigate the aforementioned cases in Virginia.  *See id.* at 8-9.

Here, the three filings at issue are:  (1) attempted certiorari petitions with the Supreme Court of the United States in January and February 2011; (2) attempted "writ of error coram nobis and fraud" petition with the "Mathews County Circuit Court" Virginia Courts between May and June 2011; and (3) denial of a writ of mandamus by the Virginia Supreme Court.  *See Doc. 23* at 2, 3; Doc. 26 at 7-8; *Doc. 27* at 2, 5; *Doc. 63* at 17.

The disposition of the earlier action with this Court is not res judicata for the case at bar.  *See Doc. 63* at 12.  First, the May and June 2011 events took place after Plaintiff filed the first suit.  Thus, any preclusive effect would not result in a dismissal of this entire case.  Second, while the applicable law and policies are the same and the

_____

attempted filings.  Finally, Defendants also rely on the submissions Plaintiff made in these two documents.  *See Doc. 63* at 21-24 (citing *Docs. 22, 26*).

parties overlap, the parties are not identical. *See, e.g., Garcia v. Hoover,* 223 F. App'x 785, 788 (10th Cir. 2007) (parties or their privies must be same).[2]

Third, res judicata is one of the Court's considerations when conducting its initial review under § 1915 and Rule 16. *See, e.g., id.* ("Garcia filed the current lawsuit against Hoover, Shanks, Perry, Gilbert Garcia and six other current and former NMDC officials . . .  The district court *sua sponte* dismissed Garcia's complaint under [§ 1915 and the Rule] on res judicata [and other] grounds. . . .  We agree with the district court that Garcia's claims against (at least) Hoover, Shanks, Perry and Gilbert Garcia are barred by res judicata/claim preclusion."); *Stewart v. Shannon,* CIV 12-0560 JB/KBM (Doc. 8 at 2-3 – dismissing on basis of res judicata).  Judge Hansen did not enter his order following review under 28 U.S.C. § 1915 and Fed. R. Civ. P. 12(b)(6) until September 22, 2011.  *See Doc. 27.*  This was almost two months after Judge Black allowed the first case to proceed.  *See Fawley v. Williams,* CIV 11-0061 BB-CG (Doc. 20, filed 8/3/11).

Thus, the Court is confident that Judge Hansen was aware of the potential res judicata argument with respect to the Supreme Court case allegations at issue here

---

[2] In the first action, the defendants remaining at the time of final disposition were:  Joe Williams, the Director of the New Mexico Department of Corrections; Anthony Romero, Warden of the Central New Mexico Correctional Facility; and Jai R. Walton, staff in charge of legal access at the facility.  Peter Robertson, of the Office of General Counsel represented them.  *See Fawley v. Williams, et al.,* CIV 11-0061 BB-CG (docket sheet).

The docket sheet does not show the parties' status and representation as reflected in recent filings.  Gregg Marcantel, Secretary for the New Mexico Department of Corrections is named as defendant and is represented by Mr. Robertson.  Geo Group, Inc. and Correctional Officers Dwayne Burris and Vince Wiggins are also parties in this case, represented by April White.  *See, e.g., Doc. 56* (limited discovery permitted regarding service of Vince Wiggins); *Doc. 58* (Plaintiff's pending motion for extension regarding service of Wiggins)*; Doc. 64* (order holding service matters in abeyance); *Doc. 63* at 41 (*Martinez* Report filed jointly by Robertson and White on behalf of all defendants except Wiggins, but asking for dismissal of him for failure to serve); *Doc. 86* at 2-3 (response to pending motion also filed on behalf of Wiggins).

when he issued his decision.  He no doubt did not dismiss on a res judicata basis because the Supreme Court proceeding is completely distinct from the Virginia proceedings presented in the first case.  The doctrine of res judicata is inapplicable when the "subject matter" and "claims" (or "cause of action") are not identical.   *See Garcia,* 223 F. App'x at 788 ("claim is barred by res judicata when the prior action involved identical claims"); *see also Mambo v. Vehar,* 185 F. App'x 763, 765 (10th Cir. 2006) (reciting elements from *Myers v. Olson,* 100 N.M. 745, 676 P.2d 822 (1984), including that "subject matter" and "cause of action" must be "identical").

Though the applicable law is the same for both suits, applying law to distinct facts is an entirely different endeavor.  As such, "the doctrine of res judicata is inapplicable." *Torres v. Village of Capitan,* 92 N.M. 64, 67-68, 582 P.2d 1227, 1280-81 (N.M. 1978) (case where the first and second suits challenged annexations that occurred in separate years and based on different ordinances, "[i]t was not necessary in the first suit [to] reach the question of constitutionality of the annexation statute" because "the ultimate facts necessary for the resolution of the two suits were different," and the "the issues necessarily dispositive in the prior cause were . . . different").

### D. "Three Strikes" Sanction Not Applicable & Plaintiff Has Accumulated Two Of Them To Date

Defendants make an unusual request in their *Martinez* Report, and ask the Court to invoke the "three strikes" provision to prevent Plaintiff  "from initiating further federal lawsuits" without payment under 28 U.S.C. § 1915(g).  *See Doc. 63* at 40-41.  That subsection provides:

> In no event shall a prisoner bring a civil action . . . under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an

> action . . . that was dismissed on the grounds that it is
> frivolous . . . or fails to state a claim . . . , unless the prisoner
> is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).  This Court enforces the "three strikes" provision.  *See, e.g.,*

*Mendez v. One of the Conected [sic], Wired, Members of a Big Int'l Org.,* CIV 12-0282

RB/ACT (Doc. 3) (denying permission to proceed in forma pauperis where three prior

strikes had accumulated).

   To accumulate the requisite three strikes, Defendants cite as one prior strike an

Eastern District of Virginia civil rights action where the district court's dismissal

expressly provided a § 1915(g) "caution."  *See Doc. 63* at 41.  That case dismissed for

failure to state a claim at the § 1915 screening stage.   *See also Fawley v. Johnson,*

Action No. 2:10cv175, 2010 WL 6797327, at **1, 2 (E.D. Va. Jun. 23, 2010), *aff'd,* 395

F. App'x 64 (4th Cir. 2010).  To gather two more strikes, Defendants ask this Court to

consider the proposed findings that Judge Black adopted in April 2012, which stated:

> It appears that Plaintiff has been less than truthful with the
> Court when it comes to the circumstances surrounding his
> transfer to CNMCF.  He claims that he was transferred on
> February 2, 2009, leaving him in the precarious position of
> having to file a motion for reconsideration within 12 days of
> arriving at CNMCF. . . .  However, the docket report for
> Plaintiff's § 1983 civil rights suit that he commenced in the
> United States District Court for the District of Western
> Virginia in 2009 indicates that Plaintiff was not transferred to
> New Mexico until March of 2009.  Plaintiff's § 1983 suit was
> filed in the Western District of Virginia on February 12, 2009,
> ten days after he was supposedly transferred to New
> Mexico.

*Fawley v. Williams,* CIV 11-0061 BB-CG (Doc. 35 at 5-6).  While they admit that this

was not a dismissal as "frivolous" or "malicious," they ask the Court to consider the "less

than truthful" observation.  *See Doc. 63* at 41.  As for the third strike, Defendants assert

that if the instant action is dismissed on "summary judgment" it will constitute the "fifth

federal lawsuit" dismissed before trial and the "third lawsuit dismissed on the grounds

that it is frivolous, malicious or fails to state a claim." *Id.*

For several reasons, the Court disagrees with how Defendants calculate strikes.

For example, Judge Black's suit was not dismissed until after Plaintiff filed the instant

case.  A recent Tenth Circuit decision contains a comprehensive discussion of which

dismissals qualify "strikes" under § 1915(g).  *Hafed v. Fed. Bureau of Prisons,* 635 F.3d

1172 (10th Cir. 2011); *see also Fair v. Adams,* No. 12–23616–CIV–SEITZ, 2012 WL

6012900, at \*\*2-4 (S.D. Fla. Oct. 10, 2012) (listing and describing nine categories of

suits that qualify as a strike under § 1915(g)), *recommendation adopted,* No. 12–

23616–CIV–SEITZ, 2012 WL 6019304 (S.D. Fla. Dec. 3, 2012).  Among other things,

the Tenth Circuit requires that the strikes have accumulated "when [Plaintiff] filed . . . in

this court," which here was in February 2011.  *Hafed,* 635 F.3d at 1176.  Strikes do not

vest, meaning they do not begin to "count against a litigant until he has exhausted or

waived his appeals," and this includes "petitions for certiorari in the Supreme Court."  *Id.*

Also, Judge Black's suit was dismissed on the merits after review of a *Martinez*

Report.  The case survived § 1915(e)(2)(B) review and was not dismissed for frivolity,

maliciousness, or failure to state a claim under that statute, or even on a motion to

dismiss under Rule 12.  *See Fawley v. Williams,* CIV 11-0061 BB-CG (Doc. 35).  This

case is in the same posture.   A dismissal "under 28 U.S.C. § 1915(e)(2)(B) . . . counts

as a strike."  *Hafed,* 635 F.3d at 1176.  The Tenth Circuit has not included among

qualifying strikes dismissals for failure to state a claim after screening.  In fact, noting

that it had not previously decided, "whether a district court's dismissal **subsequent to**

*screening* under § 1915A should count as a strike," *Hafed* clarified that it "now hold[s] that a dismissal **under § 1915A** counts as a strike when the action was dismissed as frivolous, malicious, or for failure to state a claim, the same grounds listed in § 1915(g)." *Id.* at 1177 (emphasis added); *compare Fair,* 2012 WL 6012900, at *3 (category five includes dismissals on a "motion to dismiss" under Rule 12).

The *Hafed* decision also did not disturb the Tenth Circuit's long-standing prior holding that, when a circuit court affirms a district court's dismissal under at the screening stage, the dismissal at the circuit level counts as a second strike.  *See id.* at 1179 ( "A circuit court's dismissal of an appeal on the ground of frivolousness would fall under § 1915(e)(2)(B)(i) and would count as a strike.") (citing *Jennings v. Natrona Cnty. Det. Ctr. Med. Facility,* 175 F.3d 775, 780-81(10th Cir. 1999)); *see also Davis v. Workman,* No. 12–7043, 2012 WL 5507238, at *2 (10th Cir. Nov. 14, 2012) (same) ("We DISMISS this appeal and impose one strike on appeal under § 1915(g). . . .  Because the district court also dismissed Davis' suit for frivolousness, Davis now has two strikes under § 1915(g).").

A review of nationwide federal records shows that, to-date, Plaintiff has filed seven district court cases and appealed three times.  *See Hafed,* 635 F.3d at 1175 (to calculate strikes, court "reviewed appellant's numerous dismissals from this court and other courts").  Plaintiff has accumulated two strikes by virtue of his appeal of the Eastern District of Virginia decision that dismissed for failure to state a claim and cautioned him.  The Fourth Circuit affirmed "for the reasons stated by the district court." *Fawley v. Johnson,* 395 F. App'x 64 (4th Cir. 2010).  Plaintiff's other actions that are final

do not qualify.[3]  His currently-pending habeas action likely will not qualify as the final

strike, but this Court cannot make a definitive determination until those proceedings

finally conclude and the Court can ascertain how the other courts characterized and

treated the matter.[4]

### E.  Notice To Plaintiff That Other Filing Restrictions Are Recommended

This Court will impose filing restrictions under its inherent powers on litigants who

prove to be "abusive" and "repetitive."   *See, e.g., Mendez v. One of the Conected [sic],*

---

[3] Those cases are as follows:  This Court denied Plaintiff's the other civil rights action, discussed above, after *Martinez* Report briefing.  Plaintiff did not appeal.  *See Fawley v. Williams, et al.,* CIV 11-0061 BB/CG.  This Court did not dismiss Plaintiff's patently duplicative federal habeas action as frivolous.  The Court granted him permission to proceed in forma pauperis, noted that the petition was possibly successive, declined to transferred it to the proper forum of Virginia, and dismissed without prejudice.  Plaintiff did not appeal.  *Fawley v. Janecka,* CIV 09-0892 WJ/RHS.

The Eastern District of Virginia considered Plaintiff's federal habeas petition untimely and found no grounds for tolling.  *See Fawley v. Johnson,* No. 2:09cv452, 2010 WL 2483904 (E.D. Va. Apr. 13, 2010), *recommendation adopted,* 2010 WL 2483988 (E.D. Va. Jun 16, 2010). The Fourth Circuit denied a certificate of appealability.  *See Fawley v. Johnson,* 395 F. App'x 63 (4th Cir. 2010).

A Western District of Virginia magistrate judge allowed Plaintiff to proceed in forma pauperis.  *See Fawley v. Johnson,* Civil Action No. 7:09-cv-0041-JLK (Doc. 9).  The district judge later considered Plaintiff's § 1983 claims that Virginia Department of Corrections policies denied him access to the courts on the merits and granted summary judgment in favor of defendants.  *See Fawley v. Johnson,* 7:09–cv–0041, 2011 WL 3240537 (W.D. Va. Jul. 28, 2011). The Fourth Circuit affirmed.  *See Fawley v. Johnson,* No. 11-7147, 2012 WL 540829 (4th Cir. Feb. 21, 2012).

[4]   As of March 11, 2013, the other federal habeas action Plaintiff filed in the Eastern District of Virginia is pending on the magistrate's February 22, 2013 recommendation that the action be dismissed under 28 U.S.C. § 2244(b), for failure to obtain authorization from the Fourth Circuit to proceed with a successive petition.  *See Fawley v. Clarke,* 2:12-cv-0400-MSD-LRL (Doc. 35 at 5).  Ordinarily in this Circuit, the three strikes provision "applies to civil actions but not to habeas applications."  *See Akers v. Davis,* 400 F. App'x 332, 333 (10th Cir. 2010) (citing *Jennings,* 175 F.3d 780); *but see Fair,* 2012 WL 6012900, at * 4 (category 8 - appeals dismissed as frivolous or malicious or for failure to state a claim qualify); *and Hafed,* 635 F.3d at 1176, n.2 ("Three courts outside this circuit have denied appellant leave to proceed ifp in civil cases on the basis that he had three strikes. . . .  Their orders are summary, however, and we cannot conclude without further inquiry that the listed dismissals constitute strikes that count . . . under Tenth Circuit law.").

*Wired, Members of a Big Int'l Org.,* CIV 10-0554 BB/WDS (Doc. 4) (initial filing

restrictions); *Mendez v. One of the Conected [sic], Wired, Members of a Big Int'l Org.,*

CIV 12-0408 MV/ACT (Docs. 2, 3) (additional filing restrictions); *Stewart v. Shannon,*

CIV 12-0560 JB/KBM (Doc. 8 at 2-3 – dismissing on basis of res judicata and imposition

of filing restrictions).  The proceedings in this case illustrate that Plaintiff is perilously

close to having crossed that line.

　　　　For example, the Court recognizes that the Department does not make

typewriters available to inmates, and that they must handwrite the documents they

compose for filing with this Court.  *See* Legal Access, CD-121001, § H.8 ("The

Department shall not make computers or typewriters available to inmates in the Unite

Education Resource Center for the purpose of enabling inmates to do legal work.

Typing paper and other typing supplies will not be supplied.  New Mexico State and all

Federal Courts accept hand[-]written documents.").  However, Plaintiff uses exceedingly

small and often messy handwriting.  While the Court must file these handwritten

materials, it need not consider materials that are largely illegible and/or exceedingly

difficult to decipher, even with the aid of a magnifying glass and the zoom function on

electronic documents.

　　　　**Plaintiff is on notice that he should endeavor to write more clearly or face**

**the possibility that he will be required to rewrite his submissions.  Likewise, he is**

**on notice that cartoonishly large print will be interpreted as contemptuous and**

**too difficult to tolerate.**

　　　　Furthermore, Plaintiff has proven to be incapable of desisting from serial filings,

frequently with duplicative allegations and exhibits, and that has unnecessarily

complicated and delayed disposition of pending matters, particularly in light of the difficulty in reading his submissions.  For example, this Court set a briefing schedule on the *Martinez* Report originally calculated to conclude in mid-September 2012.  *See Doc. 47.*  When one Defendant requested the Court to prevent Plaintiff from filing additional motions without leave of Court, the Court denied the motion without prejudice in recognition of the difficulties Plaintiff was having at the time in serving Defendant Wiggins.  Nor did the Court wish to become side-tracked with an evidentiary hearing on the service or any other matter.  *See Doc. 56.*  As such, the Court entered an order stating that, in light of the *Martinez* Report arguments, it was holding the service-related motions in abeyance and would address them, if necessary, in the proposed findings based on the *Martinez* Report.  *See Doc. 64.*

     That did not leave the case running smoothly.  The Court next entertained pro se motions filed after the *Martinez* Report and the Court's abeyance order.  The Court reiterated that the service matters were in abeyance.  *Doc. 68* at 1.  However, also recognizing that briefing may not be complete in light of one aspect of one of the pro se motions, the Court allowed defense counsel to supplement the *Martinez* Report with slightly new deadlines.  *See id.* at 3-4.  The Court also noted that relief on Plaintiff's First Amendment claim is "subject to a showing of actual injury, already extensively discussed in the *Martinez* Report."  *Id.* at 3.  This observation came some three weeks before Plaintiff's response was due, and his responses specifically address actual injury.  *See id.; see also Docs. 71, 72.*  The Court further noted, however, that it "will not entertain any further delays in that briefing schedule absent extraordinary circumstances" and reminded Plaintiff that, although he is permitted to "cite statutes and

cases to the Court in his response, it is not necessary for him to do so because . . . the Court is cognizant that he is proceeding pro se and . . . will conduct an independent review of the law." *Doc. 68* at 3.

Thus, after this last order, it was clear that the Court was not going to impose sanctions prior to completion of briefing, was deferring service issues in favor of resolving the *Martinez* Report, focused all parties critical aspects prior to completion of briefing, and made it clear that it intended to proceed without delay.  Instead, of allowing that to unfold, after the deadline for briefing closed, Plaintiff filed no less than 14 documents labeled "motion" or "response" or "brief" or "notice" or "objections."  As of the last review of the docket, his latest filing was March 13, 2013.  *See Docs. 75, 76, 77, 78, 79, 81, 82, 83, 85, 87, 89, 90, 92, 95, 96, 97.*  Defendants responded to some of them.

The Court has reviewed all of these filings and finds them duplicative of his complaints here about the New Mexico policies that apply to him and the alleged "actual injury" he suffered, or a complaint about the most recent incident of application of the policies to him, or an attempt to amend without permission, or a request for relief on matters already dismissed, or challenges about Virginia Department of Correction policies that cannot be addressed here.  The Court will not otherwise discuss these motions in detail, and to the extent they are coded as pending motions, it is recommended that they be denied.[5]

---

[5] *See, e.g., Doc. 27* at 4 (dismissing Plaintiff's claim that his "sentence has been increased without due process" as "frivolous" under § 1915(e)(2)(B)(i)); Doc. 81 ("motion in support of his claim that his sentence was added to without out due process of law"); see also Docs. 79, 80 (Defense contention that Plaintiff's post-briefing allegation raises new claim); *Trujillo v. Williams,* 465 F.3d 1210, 1222 & n.13 (10th Cir. 2006) (claims concerning Virginia policies are to be brought in Virginia courts).

In light of his litigation practice of relentless papering and thereby delaying when matters ripen for disposition, Plaintiff is ***likewise hereby notified*** that this Court has the inherent power to impose a variety of sanctions on litigants in order to, among other things, regulate its docket and promote judicial efficiency.  *Martinez v. Internal Revenue Service,* 744 F.2d 71, 73 (10th Cir. 1984).  **One such sanction is dismissal for failing to abide by orders of the Court.**  *See, e.g., Costello v. United States,* 365 U.S. 265, 286-87 (1961) (district court may dismiss *sua sponte* for failure to comply with order of court); *United States ex rel. Jimenez v. Health Net, Inc.,* 400 F.3d 853, 856 (10th Cir. 2005) ("We . . . dismiss the appeal sua sponte as to both Appellants for lack of prosecution as reflected by their failure to respond to our order requiring a timely status report to prevent dismissal. . . .  Dismissal of the appeal is a strong sanction to be sure, but it is no trifling matter for Appellants to abuse our office by disappearing and failing to meet our deadlines.  ***The federal courts are not a playground for the petulant or absent-minded; our rules and orders exist, in part, to ensure that the administration of justice occurs in a manner that most efficiently utilizes limited judicial resources.***") (emphasis added).

In the event that Plaintiff fails to abide by the above admonition about handwriting, or persists in unnecessary serial filings in this case, the Court will impose appropriate sanctions governing this and any future litigation.

### III. Law Regarding PLRA Exhaustion

Defendants first cite Plaintiff's voluminous grievances from December 2010 through July 2012 as evidence of harassment.  *See Doc. 63* at 35-36.  But they also contend that, for the purposes of this suit, Plaintiff failed to exhaust with respect to:  (1)

the petition for certiorari with the Supreme Court, *see id.* at 19-21; (2) the writ of mandamus with the Virginia Supreme Court, *see id.* at 22-23; (3) the writ of error with the Mathews County Virginia Circuit Court, *see id.* at 23-24; and (4) the contention that his legal mail was opened, *id.* at 25-26. The Court sets forth the general principles here but, like Defendants, finds it more efficient to discuss exhaustion in conjunction with the merits of each claim below.

"[U]nder the Prison Litigation Reform Act of 1995 ("PLRA") . . . '[i]nmates are required to exhaust available administrative remedies, and suits filed before the exhaustion requirement is met must be dismissed.'" *Davis v. Jones,* 390 F. App'x 803, 804 (10th Cir. 2010) (quoting district court opinion). An inmate must fully exhaust the grievance process by "'using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" *Woodford v. Ngo,* 548 U.S. 81, 90 (2006) (citation omitted) (emphasis original); *see also Hicks v. Jones,* 332 F. App'x 505, 506 (10th Cir. 2009) ("'An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under the PLRA for failure to exhaust his administrative remedies.') (quoting *Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir. 2002)).

If an inmate does not do so, the Court has no choice but to dismiss his claims on this basis alone. *See Mitchel v. Figueroa,* 489 F. App'x 258, 260 (10th Cir. 2012) ("the record also indicates that he failed to fully exhaust the remedies available to him. Thus, the district court was required under the PLRA to dismiss his complaint."); *Davis,* 390 F. App'x at 804 (because prisoner did not exhaust, "we are obliged to conclude the district court was correct to dismiss his suit"). As recently held in this District:

> Plaintiff's allegations, if taken as true, paint a disturbing picture. The Court is very concerned about the circumstances giving rise to this complaint and the serious physical injuries suffered by Plaintiff. However, under the strict terms of the PLRA, the Court may not address the merits of Plaintiff's complaint without first being satisfied that all available administrative remedies were exhausted. This Court has no discretion to excuse noncompliance with prison grievance procedures. *Booth v. Churner,* 532 U.S. 731, 738–41 (2001). Because the Court has found that Plaintiff failed to exhaust all available administrative remedies prior to filing suit, the complaint must be dismissed.

*Rouse v. Baca,* No. CV 11–0433 MV/CG, 2012 WL 4498866, at *7 (D.N.M. Sep. 25, 2012).

On the other hand, the Tenth Circuit has "'obligated district courts to ensure that any defects in exhaustion are not procured from the action or inaction of prison officials.'" *Whitmore v. Jones,* 456 F. App'x 747, 750 (10th Cir. 2012) (quoting *Tuckel v. Grover,* 660 F.3d 1249, 1254 (10th Cir. 2011)). Nothing in the record or Plaintiff's responses to the *Martinez* Report hint at such conduct or address exhaustion. *See Docs. 71-72.* Neither do his post-briefing submissions. *See Docs. 75-79, 81-83, 85, 87, 89-90, 92, 95-97.*

Dismissals for failure to exhaust are made without prejudice so that the prisoner can exhaust and then return to court with another lawsuit.[6] The Grievance Policy has four steps – informal grievance by the inmate, formal grievance by the inmate for grievance officer review, warden review, and appeal to the Secretary of Corrections.

---

[6] *See Wilson v. Benzona,* 485 F. App'x 976, 978 (10th Cir. 2012) (panel affirmed dismissal "[b]ut because the district court incorrectly dismissed the case with prejudice, we REMAND to the district court so that it may modify its dismissal to be without prejudice for failure to exhaust administrative remedies."); *Mitchel,* 489 F. App'x at 260 ("Because the district court dismissed the complaint without prejudice, Mitchell can refile if and when he actually exhausts his administrative remedies.").

*See Doc. 63-8* at 21-28 (Inmate Grievances Policy, CD 150500, §§ D-E); *Doc. 63-9* at 1-7 (Inmate Grievances Policy, CD-150501, §§ A-D); *see also Rouse,* 2012 WL at **4-6. At most, however the entire process from start to finish will last "[n]o more than 90 working days," and if at the end of that time the grievance the inmate is pursuing "is not disposed of . . . the inmate shall be deemed to have exhausted [his] administrative remedies for that specific complaint."  Inmate Grievances Policy, CD 150500, §§ G.1, G.5.  But if Plaintiff filed this suit without fully completing the grievance process, either because it was available to him and he chose to bypass it, or because the ninety days expired without him availing himself of the opportunity to move through the levels of review, Plaintiff failed to exhaust.  *See, e.g., Rouse,* 2012 WL at *6.  Thus, dismissal for failure to exhaust in this case would effectively constitute a dismissal of that claim with prejudice because Plaintiff has no remaining means to further exhaust before returning to this Court.[7]

## IV.  Law Regarding Access To The Courts & Policies At Issue

### A.  Limited Scope Of Constitutional Right As Provided By Supreme Court

While some aspects of the right of access to the courts is well-settled, the exact contours of the right are not set with bright lines by binding authority.

---

[7] *C.f., Braxton v. Zavaras,* 614 F.3d 1156, 1161-62 & n.4 (10th Cir. 2010) (under Colorado law, even if PLRA exhaustion requirement is considered an "extraordinary circumstance" that prevents inmates from timely filing suit, if inmates are not diligent while further exhausting and returning to federal court after dismissal, equitable tolling inapplicable; in footnote declining to address defense argument that at best statute of limitations was tolled for forty-five days and then "'effectively exhausted.'"); *Roberts,* 484 F.3d at 1241-42 (under New Mexico law, three-year federal statute of limitations for § 1983 claims does not run due to statutory tolling while an inmate grievance is pending but uncompleted and to determine how long [the inmate's] claim should be tolled, we must know how long his grievance remained viable under the institution's grievance procedures in effect at the time of [the] grievance;" equitable tolling requires an "extraordinary event beyond" Plaintiff's control).

For decades "[i]t [has been] established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977). "Meaningful access . . . is the touchstone."  *Id.* at 823 (internal quotations, citation, and alterations omitted); *see also Lewis v. Casey,* 518 U.S. 343, 350, 351 (1996).  The inmate must show "actual injury" to prevail on an access claim.  *See Lewis,* 518 U.S. at 349.  Allegations that programs implemented by the State to facilitate access are "subpar in some theoretical sense" will not suffice.  *Id.* at 351.  Instead, the inmate must show that he was unable to pursue an arguably meritorious action.  *See id.* at 351, 353, & n.3.

In its most recent decision touching on the subject, the Supreme Court noted:

> However unsettled the basis of the constitutional right of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court.  We indicated as much in . . . *Lewis v. Casey, supra,* where we noted that . . . the named plaintiff must identify a "nonfrivolous," "arguable" underlying claim [and] the predicate claim [in an initial pleading must] be described well enough to apply the "nonfrivolous" test and to show that the "arguable" nature of the underlying claim is more than hope.

*Christopher v. Harbury,* 536 U.S. 403, 414-16 (2002).

The Supreme Court also stated in *Lewis* that inmates have no right to "discover grievances" or to "litigate effectively" once they gain access to a court.  *Id.* at 354.  An earlier Tenth Circuit decision had indicated the same thing in slightly different terms: "an inmate's right of access does not require the state to supply legal assistance beyond the preparation of ***initial pleadings*** in a civil rights action regarding current confinement or a petition for a writ of habeas corpus."  *Carper v. DeLand,* 54 F.3d 613,

617 (10th Cir. 1995) (emphasis added).

The right of access presently does not apply to every type of legal action.  Thus far, the Supreme Court has identified only three types – "direct appeals from the convictions for which they were incarcerated," "habeas petitions," and "actions under 42 U.S.C. § 1984 to vindicate 'basic constitutional rights.'"  *Lewis,* 518 U.S. at 354.  The Tenth Circuit makes a distinction between "affirmative assistance," which is required for the three *Lewis* categories, and a prohibition on "erect[ing] barriers" that "interfere with and impede" an inmate's access in other types of actions:

> As we stated in *Simkins v. Bruce,* 406 F.3d 1239 (10th Cir. 2005), "[i]n order to provide inmates a meaningful right of access to the courts, 'states are required to provide affirmative assistance in the preparation of legal papers in cases involving constitutional rights and other civil rights actions related to their incarceration, but in all other types of civil actions, states may not erect barriers that impede the right of access of incarcerated persons.'"  *Id.* at 1242 (quoting *Snyder v. Nolen,* 380 F.3d 279, 290-91 (7th Cir. 2004)).  Thus, although *Lewis* limits the types of cases in which the prison must provide affirmative assistance, it does not give free reign to prison authorities to interfere with and impede a prisoner's pursuit of other legal actions.

*Cohen v. Longshore,* 621 F.3d 1311, 1317 (10th Cir. 2010).

Although the *Cohen* decision did not comment on the district court's "initial pleading" language from *Carper,* courts in this Circuit continue to adhere to the *Carper* limitation, and hold that "the right of access to the courts extends only as far as protecting an inmate's ability to prepare initial pleadings."  *Gilbert-Mitchell v. Allred,* No. 12-CV-01997-BNB, 2013 WL 229996, at *2 (D. Colo. Jan. 22, 2013) (citing *Carper, Lewis,* and *Wolff v. McDonnell,* 418 U.S. 539, 576 (1974)); *see also, e.g., Gee v. Shiller,* Nos. 96-8124, 97-8033, 1998 WL 43155, at * 1 (10th Cir. Jan. 27, 1998) ("this circuit has

long interpreted Supreme Court precedent to limit a prisoner's right of access to the courts to legal assistance in the preparation of initial pleadings. . . . *Lewis* . . . confirms our interpretation of the law on this point."); *see also Muhammad v. Workman,* CIV 12-094-RAW-SPS, 2012 WL 5389738, at *11 (E.D. Okla. Nov. 5, 2012) (citing *Carper, Lewis,* and *Wolff*); *Boyd v. Werholtz,* No. 09–3184–SAC, 2010 WL 4180590, a * (D. Kan. Oct. 20, 2010) (citing *Bounds, Carper, Lewis, Wolff,* and *Hudson v. Palmer,* 468 U.S. 517, 523 (1984)).

Although *Cohen* also does not permit prison authorities to "interfere and impede" any legal action, it does not overrule the principle that "inmates do not have the right to select the method by which access will be provided." *Penrod v. Zavaras,* 94 F.3d 1399, 1403 (10th Cir. 1996) (citing *Ramos v. Lamm,* 639 F.2d 559, 583 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041 (1981)); *see also Easterwood v. Kirby,* 86 F. App'x 396, 397 (10th Cir. 2004) (same) (citing *Bounds* and *Penrod*); *Dahler v. Goodman,* 47 F. App'x 902, 907 (10th Cir. 2002) (same) citing *Bounds, Carper, Lewis,* and *Penrod*).

### B.  Further Limitations For ICC Inmates Based On Tenth Circuit Caselaw

Where an access to the court claim involves an inmates subject to ICC transfers, a distinct set of court-imposed rules apply.[8]  In this Circuit, while both jurisdictions retain

---

[8] The statutes in New Mexico and Virginia that adopt the ICC do not specifically address access to the court programs and merely provide that the specific contract between the states "shall provide for" duration, payment, inmate employment, the transfer, and "other matters as may be necessary and appropriate to fix the obligations, responsibilities and rights of the sending and receiving states."  N.M. Stat. Ann. § 31-5-17, Art. 3(A)(5); *see also* Va. Code. Ann. § 53.1-216 (identical in substance).  The ICC contract between New Mexico and Virginia is not in the record.  If it is the same 1982 contract submitted in this Court's *Trujillo* case, the contract does not address legal access services.  *See Trujillo v. Williams,* CIV 04-635 MV/WDS (Doc. 54-1 at 5-16).  Geo Group's contract provides that it will comply with constitutional, American Correctional Association, and County/NMCD standards.  *See Doc. 63-1* at 5 (§ 4.1).  It specifically mentions law libraries, but not photocopying or legal access.  *See id.* at 11 (§4.3.13).

obligations concerning access to the courts, neither state is constitutionally responsible for supplying the inmate with materials pertaining to the foreign state.  Thus, the sending state generally remains responsible for providing access to legal materials pertaining to that state, in whatever manner that state provides.  And, unless the receiving state has out-of-state materials actually available in its facility, it is only responsible for providing access to legal materials for that state and for suits brought there.  *See Trujillo v. Williams,* 465 F.3d 1210, 1226-27 (10th Cir. 2006) ("New Mexico as the sending state bears the burden of providing the required state legal materials [pertaining to a] habeas petition" challenging his New Mexico sentence); *Clayton v. Tansy,* 26 F.3d 980, 981 (10th Cir. 1993) ("When the receiving state in an interstate compact agreement does not have legal materials pertaining to the laws of the sending state, the sending state is obliged to satisfy in some reasonable manner the constitutional right of out-of-state inmates to meaningful access to the courts.") (internal quotations and citations omitted); *Baca v. Mondragon,* No. 96-2027, 1996 WL 330290, at *1  (10th Cir. Jun. 6, 1996) ("We have held that when a prisoner is transferred out of state, the sending state bears the burden of providing the required state legal materials. . . .  However, common sense requires us to conclude that if the receiving state provides the required legal assistance, the prisoner has received that to which he is entitled."); *Mears v. Thomas,* No. 94-2270, 1996 WL 211739, at **2-3 (10th Cir. Apr. 30, 1996) (Kansas inmate transferred to New Mexico; claim challenging New Mexico photocopying policies denied on merits, but claim that New Mexico defendants failed to provide Kansas law denied because New Mexico was the receiving state).

### C. Photocopying

The Supreme Court has not commented on restrictions to photocopying.  In an older case involving now-superseded Supreme Court rules, then Tenth Circuit held that prisoners have no right to unlimited access to free copies when there are suitable alternatives available.  In light of the rules at the time, the Court had reason to question the prisoner's assertion that the Supreme Court "would not file his two petitions for certiorari until copies of the judgments and/or decrees sought to be reviewed were appended to his petitions."  *Harrell v. Keohane,* 621 F.2d 1059, 1061 (10th Cir. 1980). Nevertheless, both *Harrell* and an earlier decision both recognize that "reasonable regulations are necessary to balance the legitimate interests of inmate litigants with budgetary considerations and to prevent abuse."  *Id.* (citing *Twyman v. Crisp,* 584 F.2d 352 (10th Cir. 1978)).  The "reasonable alternative" recognized by the Tenth Circuit is to handwrite copies.  *See Frazier v. Zavaras,* No. 10-cv-02534-CMA-KMT, 2011 WL 4537001, at * 4 (D. Colo. Sept. 30, 2011) (citing *Holt v. Werholtz,* 185 F. App'x 737, 740 (10th Cir. 2006)); *but see Johnson v. Parke,* 642 F. 2d 377, 370 (10th Cir. 1981) ("when numerous copies of often lengthy complaints or briefs are required, it is needlessly draconian to force an inmate to hand copy such materials when a photocopying machine is available and the inmate is able and willing to compensate the state for its use.  Allowing inmates to pay for and receive photocopies of the legal materials required by the courts is part of the "meaningful access" to the courts that inmates are constitutionally entitled to.").

When the Tenth Circuit later declined to decide whether a $300 cap on advances to inmates for copying and postage is "reasonable," it did reiterate that "reasonable

restrictions based upon budgetary concerns are acceptable." *Harrison v. Bent Cnty. Corr. Facility,* 24 F. App'x 965, 967 (10th Cir. 2001); *see also Penrod v. Furlong,* No. 94-1064, 1994 WL 672655, at *1 (10th Cir. Dec. 1, 1994) ("Appellant claims that he is denied meaningful access to the courts because he does not receive postage and photocopying privileges when his prison account is empty. . . . [T]he record indicates that Appellant has had ample funds available to him during the course of his imprisonment which he chose to spend on other items.  Postage and copying are available to the Appellant, but there is no requirement that they be provided free of charge.").  The Tenth Circuit has not spoken on the issue since *Harrison.*  The District of Colorado's recent decision in *Frazier* held that denying photocopying services to an inmate whose arrearage was more than double the $500 cap, was reasonable given that the inmate could have used the alternative of handwriting his "legal papers." *Frazier,* 2011 WL 4537001, at *4.

### D.  Policies

New Mexico forbids inmates from assisting each other in preparing court materials.[9]  Instead, they have access to "designated staff"  (here Defendant Burris), a "legal access monitor" (here Defendant Wiggins), or "NMCD attorneys" under certain circumstances.  *See Legal Access,* CD-121001, §§ I.1-4.[10]  Plaintiff challenges the

---

[9] *See Legal Access,* CD-121001, §§ D. I.4.a-f (Department will not establish an inmate assistance program, and inmates who assist each other can be disciplined).

[10] Defendant Burris was the paralegal and librarian at the Lea County Correctional Facility, bound by, and responsible for, enforcing the policies, but others are responsible for interpretation and oversight of the policies.  *See, e.g, Doc. 22* at 4, 10; *Doc. 63-4* at 22-23 (Burris Affidavit, ¶¶ 1, 2, 7-9).   Defendant Wiggins was Burris' "Legal Access Monitor."  *See, e.g., Doc. 22* at 10 (Burris "directed this question to Mr. Wiggins, my legal access monitor"). "Legal Access Monitors" have legal or paralegal training.  *See Legal Access,* CD-121000 (Definitions, § I).  They oversee and monitor the inmate legal access program.  *See id.,* CD-

regulations that:  (a) limit access to "initial filings," *see Doc. 1* at 10; *Doc. 18* at 2; *Doc. 30* at 2; (b) refuse to supply forms and legal materials other another state, *see Doc. 1* at 10-11; *Doc. 22* at 1; *Doc. 30* at 2; (c) allow prison personnel to judge whether his legal "claims" are "qualified," *Doc. 18* at 2; *Doc. 30* at 2; and (d) allow a hold to be placed on an inmate account, *see Doc. 1* at 13; *Doc. 30* at 2.  The New Mexico policies at issue, at a minimum, track the caselaw discussed above.  In some instances, the policies provide access beyond what the cases identify.

**(1) Legal Access – Generally Limited to "Initial Filings" And "Qualified Legal Claims."**  Among other things, designated staff members are authorized to assist "illiterate inmates who request assistance ***in the actual preparation of their initial pleadings or petitions*** for filing with the courts."  *Legal Access,* CD-121001, § I.1.h. (emphasis added).  "Initial filings" are limited to:  "The filing of a complaint, pleading or petition with a court of law to begin a legal action in that court.  An initial filing also includes the filing of all notices or other documents that may be required prior to the filing of the pleading or petition, including the initial filing of amended complaints or petitions."  *Legal Access,* CD-121000 (Definitions, § H).  Limiting "actual preparation" assistance to "initial filings" for those who need such assistance thus acknowledges and memorializes the *Cohen* "affirmative assistance in preparation" and the *Cohen/Gee* "initial pleadings" holdings.

---

121001, §§ I.2(a)-(g).  They are specifically responsible for resolving any questions designated staff members have about the program and, in turn, for contacting "NMCD Attorneys" with questions the monitor may have.  *See id.,* §§ I.2.(c), I.3, J.10.a.  Inmates are required to "attempt to resolve issues related to this policy or their legal access to the courts through designated staff before contacting the Legal Access Monitor."  *Id.,* § I.4.h.

Designated staff members also assist inmates:  (1) "in obtaining forms for qualified legal claims," *Legal Access,* CD-121001, § I.1.g; (2) photocopying "qualified legal materials," *id.,* § I.1.g; *see also id.,* § I.1.d; and (3) notary services, *see id.,* §§ I.1.e-f.  "Qualified" legal claims and materials are also defined as follows*:*

> "O.  *Qualified Legal Claims:*  In the direct appeal, any claim of error; in the Post Conviction Relief proceeding, any non-precluded claim set forth in Rule 5-802 NMRA; and in Federal Court, any claim of error based on a violation of the federal constitution or law.  Forms include the Notice of Appeal from the District Court (state court); Writ of Habeas Corpus, NMSCRA Rule 9-701; Writ of Certiorari, Rule 12-502 NMRA; §2254 Petition for a Writ of Habeas Corpus in Federal Court; a civil rights action or condition[s] of confinement claim (42 U.S.C. § 1983 and Rule 1-1076 NMRA); and a State Tort Complaint concerning conditions of confinement;  Divorce proceedings (with and without children); Power of Attorney (general and for minor children); and Last Will and Testament.
>
> P.  *Qualified Legal Material:*  Any document that meets the definition of a Qualified Legal claim, plus related motions, responses, discovery matters and letters to the court in connection with the qualified legal claim.

*Legal Access,* CD-121000 (Definitions, §§ O-P) (italics and underlining original).

The legal access policy does not allow designated staff to "[a}ssist inmates . . . beyond the initial filing of their pleadings," unless they are assisting inmates with matters "listed in attachment CD-121001.D," which pertains to copying.  *Id.,* CD-121001, § I.1.n.3.

The "Qualified Legal Materials Copying" attachment lists what copying encompasses.  It provides that any document meeting the definition of "qualified legal claim" and associated "material" qualifies.  It further lists many different types of actions, well beyond the three mentioned by *Lewis:*  direct appeals from convictions; state and federal habeas petitions; conditions of confinement claims under §1983 and state tort

law; "certificate[s] of service by mail;" "motion[s] to amend judgment and sentence," "motion[s] for reconsideration of sentence;" "request[s] and notice[s] for telephonic hearing;" divorces with or without children; general power of attorney; power of attorney for minor children; and last will and testament." *Id.* (Attachment CD-12001.D).

Thus, consistent with *Cohen*'s recognition that prison officials cannot impede actions in general, the legal access policy also requires providing forms and copying and notary services beyond the three categories of suits identified by *Lewis,* and beyond the initial filings to encompass other filings necessary to pursue a lawsuit with initial-level courts in the federal and state systems.

Notices of appeal, petitions for certiorari, and related materials are not among the defined qualifying documents and many sections of the policies reiterate the initial pleading, qualified legal claim, and qualified legal materials parameters.[11]  However, a list of available "Legal Texts and Resource Material" and "Court Form Packets" includes "Federal Rules of Civil Procedure," "Post-Conviction Relief Forms" (which contains an

---

[11]  *See, e.g.,* Legal Access, CD-121000 (Definitions, § A) (""Inmates shall not be barred from the courts and the Department shall, when written requests are made, assist inmates in the preparation and initial filing of (1) direct appeals from the convictions for which they were incarcerated, (2) Habeas Corpus petitions (§2254 in Federal Court and NMSCRA Rule 5-802 in State Court), (3) §1983 civil rights actions, (4) conditions of confinement actions, (5) state tort complaints concerning conditions of confinement and (6) Divorces (with or without children)." *See id.* (Definitions, Conclusion – "The Department facilitates . . . access by making forms and specific legal assistance available to the inmate population for qualified legal claims. . . .  This policy prohibits inmates from providing legal assistance to other inmates related to qualified legal claims."); *id.,* CD-121001, § I.1.n.3 ("Designated staff shall not: . . . Assist inmates in qualified legal claims beyond the initial filing of their pleadings with the courts, except as listed in [Attachment CD-121001.D Qualified Legal Materials Copying]."); *id.,* § I.2.b (among other things, Legal Access Monitors are to "[e]nsur[e] that designated staff is assisting inmates on matters involving qualified legal claims only and only at the initial pleading stage"); *id.,* § J (introduction – "Inmates may receive active assistance in the initial filing of pleadings involving qualified legal claims from the designated staff"); *id.,* § J.8.a ("Designated staff shall meet with inmates to provide necessary assistance with preparation of the initial pleading for filing . . . Designated staff shall not provide assistance beyond the initial filing stage.").

"Appeal Packets," and "State Appeal Packet. *Id.* (Attachments CD-121001.B-C). If the federal rules source also includes the Federal Rules of Appellate Procedure and the Rules of the Supreme Court of the United States, then the "Appendix of Forms" to the appellate rules and Supreme Court Rule 14 provides the precise format for notices of appeal and petitions for certiorari.

>           (2)  **Photocopying Limited To "Qualified Legal Claims And Materials,"**
> **For Which The Inmate Has Sufficient Funds, After Application Of A $300.00**
> **"Advance."** The photocopying policy limits copying to "[o]nly requests for . . . qualified legal materials regarding qualified legal claims." *Photocopying,* CD-121201, § A.1. The photocopying policy contains the same definitions for "qualified legal claims" and "qualified legal material" as the legal access policy. *See id.,* CD-121200 (Definitions, §§ C, D).[12]

Designated staff members are responsible for determining whether the copying request satisfies the definition of "qualified." *See, e.g., id.* (Conclusion – "All requests for the copying of qualified legal materials shall be made to the designated staff, which shall ensure that the requested copying is qualified."); *id.,* CD-121201, § A.2 ("The designated staff shall ensure that the material requested for copying is qualified.").

---

[12] The photocopying policy refers to two legal access policy attachments. It clearly means to reference the "Request / Authorization For Copying Qualified Legal Materials" (Form CD-121001.2), and the "Qualified Legal Materials Copying" list (Attachment CD-121001.D.). However, the most recent versions of the photocopying policy contain a typographical error and cite the wrong attachment for the copying list. This is clear from the context and history of amendments. The 2008 version of the Legal Access policy included the copying list as Attachment "F." *See Fawley v. Williams,* CIV 11-0061 BB-CG (Doc. 34-5 at 23). The 2008 version of the photocopying policy correctly cited the list as Attachment "F." *See id.* (Doc. 34-8 at 3). In 2009, the list became Attachment "D" to the legal access policy, *see id.* (Doc. 34-6 at 21), but the 2009 and 2010 versions of photocopying policy continued to refer to it as "F," *see id.* (Doc. 34-9 at 3; Doc. 34-10 at 3). The list remained as Attachment "D" in the 2010, 2011, and 2012 versions of the legal access policy, *see id.* (Doc. 34-7 at 21); *see also Doc. 63-3* at 24 (the instant case); *Doc. 63-4* at 21 (same). The 2011 and 2012 versions of the photocopying policy now mistakenly cite the copying list as Attachment "C." *See Doc. 63-4* at 27, 35.

Inmates are responsible for supplying the designated staff member with sufficient information to make their "qualification" decision:

> Failure to attach sufficient documentation to enable designated staff to determine if documents are qualified may result in a delay.  The designated staff shall deny a request that is vague or does not substantiate a qualified legal claim.  It shall then be necessary for the inmate to submit another request with sufficient documentation.

I*d.,* § B.1.  Inmates are also responsible for the costs of photocopying qualified legal materials and notary services, and the designated staff member is required to contact the appropriate officer to ascertain whether the inmate's account has sufficient funds for the copying request, and whether it is under a "hold."  *See id.,* CD-121200 (Conclusion); *id.,* CD121201, §§ B.6, B.9, C.1 – C.5, C.9.

A "hold," is a "restriction on an inmate's account or funds[,] based upon financial obligation owed by the inmate," and the restriction remains in place "until the obligation is paid."  *Id.,* CD-121200 (Definitions, § B); *see also Legal Access,* CD-121000 (Definitions, § G) (same).  The hold may be in place due to another obligation or may be necessary due to by the costs associated with the photocopying request itself.  The policy only directs that a copying request be denied if the combined arrearage will exceed $300.00:

6.  Designated staff shall:

a.   Contact the Inmate Accounts Office to determine the inmate's account balance to ensure that the inmate has paid for the copies or that the account has been placed on hold in accordance with this policy.  If the payment has been made or the account has been appropriately placed on hold, make photocopies . . . .

b.   Refrain from photocopying any documents if it is determined that the inmate's account balance is insufficient to cover the entire service charge and any hold placed on the inmate's account for the services

would cause the inmate to owe the department an amount exceeding $300.00 . . .

*Photocopying,* CD-121201,§§ B.6.a-b; *see also id.,* §§ C.8.a.1-2.  The $300 window thus acts as an "advance" for inmates.  *See Doc. 63* at 18.

### (3) ICC Transferees From Other States Must Secure Materials From The Sending State & Under The Plain Terms Of The Photocopying Policy Can Obtain Copies For Matters Destined For Courts Outside Of New Mexico.  The Department assists the New Mexico inmates it houses out of state with legal access. For these inmates, legal access monitors receive the written requests from these inmates, and forward the requests to the appropriate designated staff.  *See Legal Access,* CD-121001, §§ J.8, J.11.  The designated staff member will mail the New Mexico inmate the appropriate materials but "shall not provide assistance beyond the initial filing stage."  *Id.,* § J.8.a.  Conversely, out-of-state inmates who are housed in New Mexico under the ICC must request the sending department for out-of-state materials and/or assistance.  Prisons in New Mexico "shall <u>not</u> supply inmates with forms, documents or any legal materials from other states.  It shall be the duty of the inmate to contact the appropriate authority in that state to request any forms, documents or legal materials from that state."  *Id.*, §H.6.  This dichotomy is consistent with the long-standing position taken by the Tenth Circuit starting in *Clayton.*

Unlike the legal access policy, the photocopying policy on its face does not prohibit ICC inmates from obtaining copying materials destined for filing in out-of-state courts.  While the definitions of "qualified" legal claims and materials and associated lists do not include the federal appeals arena, the Department makes exceptions for filings in the Tenth Circuit and the United States Supreme Court.  For example, in a May

2011 memorandum to Plaintiff, Defendant Burris relayed that the policy according to Defendant Wiggins is "'If it is for out of state court **with the exception of the 10th Circuit or the U.S. Supreme Court,** we do not provide service.'"  *Doc. 63-6* at 1 (emphasis added).

But the Department takes a different view when photocopies are "to be filed in other states."  *Id.* at 16.  In that regard, Burris was instructed by his "Legal Access Monitor" that his "cannot photocopy documents to be filed in other states."  *Id.*  Plaintiff's "alternative methods to obtain copies" for such suits is to request "copies from the Court [the inmate]] file[s] documents in or . . . the agency that provides [his] legal access from Virginia" or "submit them to family or friends to have them copied."  *Id.*

Burris was sympathetic to Plaintiff's predicament, but noted that "unless the State of New Mexico changes its policy, repeated requests will offer the same result."  *Id; see also, e.g., Doc. 63-7* at 2 ("As you know, I am unable to provide services . . . for the Virginia Courts"); *id.* at 16 (You must provide me with information to confirm that this tort will be filed in New Mexico.").

### D.  Turner v. Safely Governs Challenges To Regulations

Cases that challenge prison regulations are governed by the test set forth in *Turner v. Safely*, 482 U.S. 78 (1987), regardless of whether the right at issue is of constitutional dimensions or flows from the First Amendment:

> In recent decades . . . this Court has determined that incarceration does not divest prisoners of all constitutional protections.   Inmates retain, for example . . . certain protections of the First Amendment . . . .
>
> We nonetheless have maintained that the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in

society at large.   In the First Amendment context, for instance, some rights are simply inconsistent with the status of a prisoner or with the legitimate penological objectives of the corrections system . . .   Moreover, because the problems of prisons in America are complex and intractable, and because courts are particularly ill equipped to deal with these problems, . . . we generally have deferred to the judgments of prison officials in upholding these regulations against constitutional challenge.

Reflecting this understanding, in *Turner* we adopted a unitary, deferential standard for reviewing prisoners' constitutional claims:   "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." [*Turner v. Safely,* 482 U.S. 78, 89 (1987)].   Under this standard, four factors are relevant.   First and foremost, there must be a valid, rational connection between the prison regulation and the legitimate and neutral governmental interest put forward to justify it. . . .   If the connection between the regulation and the asserted goal is arbitrary or irrational, then the regulation fails, irrespective of whether the other factors tilt in its favor. . . .   In addition, courts should consider three other factors:   the existence of alternative means of exercising the right available to inmates; the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and the absence of ready alternatives available to the prison for achieving the governmental objectives. . . .

\* \* \* \* \*

. . . under *Turner* and its predecessors, prison officials are to remain the primary arbiters of the problems that arise in prison management. . . .   If courts were permitted to enhance constitutional protection based on their assessments of the content of the particular communications, courts would be in a position to assume a greater role in decisions affecting prison administration. Seeking to avoid unnecessarily perpetuating the involvement of the federal courts in affairs of prison administration, . . . we reject an alteration of the *Turner* analysis that would entail additional federal-court oversight.

. . .   Augmenting First Amendment protection for

inmate legal advice would undermine prison officials' ability to address the "complex and intractable" problems of prison administration. . . .

* * * * *

We . . . decline to cloak the provision of legal assistance with any First Amendment protection above and beyond the protection normally accorded prisoners' speech. Instead, the proper constitutional test is the one we set forth in *Turner.* . . .

*Shaw v. Murphy,* 532 U.S. 223, 228-32 (2001) (certain quotations, citations, footnotes, and alterations omitted); *see also, e.g., Stewart v. Beach,* 701 F.3d 1322, 1330-31 (10th Cir. 2012) ("when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests") (internal quotations and citations omitted).

## V.  Analysis – The Policies Are "Reasonable" Under *Turner*

Since the policies define and limit the Department's responsibilities with regard to prisoner access to the courts, it goes without saying that the policies above necessarily "impinge" on those rights.   Accordingly, the Court should apply the *Turner* analysis to determine the "validity" of the regulations.  *See Brown v. Saline Cnty. Jail,* 303 F. App'x 678 (10th Cir. 2008) (reversing where district court only addressed access to courts aspect of case, and not validity of the mail policies under *Turner*).

The first factor – whether a rational connection exists between the regulation and the legitimate interest advanced as its justification – is an "essential requirement" of the requisite analysis.  *See, e.g., Al-Owhali v. Holder,* 687 F.3d 1236, 1240 (10th Cir. 2012) (citing *Jones v. Salt Lake Cnty.,* 503 F.3d 1147, 1153–59 (10th Cir. 2007); *Boles v. Neet,* 486 F.3d 1177, 1181 (10th Cir. 2007), and *Beerheide v. Suthers,* 286 F.3d 1179, 1185

(10th Cir. 2002)).   In the *Martinez* Report, Defendants incorrectly place the burden of this showing on Plaintiff.[13]   It is Defendants who bear the "relatively limited burden of showing that the prison regulation at issue is reasonably related to legitimate penological interests."   *Sayed v. Profitt,* 415 F. App'x 946, 948 (10th Cir.) (internal quotations omitted) (citing, among other decisions, *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)), *cert. denied,* 132 S. Ct. 142 (2011).

It is true, as Defendants indicate in reply, that the Supreme Court's decision in *Overton* requires substantial deference and does not place the ultimate burden of proving the ***validity*** of the policies under *Turner* on them.   *See Doc. 73* at 8 (citing *Overton v. Bazzetta,* 539 U.S. 126 (2003)); *see also, e.g., Beard v. Banks,* 548 U.S. 521, 528-29 (2006) (discussing *Turner* and *Overton*); *Wardell v. Duncan,* 470 F.3d 954, 960 (10th Cir. 2006) (citing *Beard, Overton,* and *Turner*); *Sperry v. Werholtz,* 413 F. App'x 31, 40 (10th Cir. 2011) (citing *Overton,* and *Turner*).   But *Overton* does not dispense with Defendants' initial burden of identifying their legitimate and neutral objectives for the Court to consider in connection with the first element.   Current Tenth Circuit authority continues to expect that initial showing to be made by Defendants.   *See Wardell,* 470 F.3d at 960; *Sayed,* 415 F. App'x at 948; *Sperry,* 413 F. App'x at 40-41. The showing is not burdensome and the inquiry is deferential.   Defendants are not obliged to come forward with "empirical evidence."

> It does not matter whether [this Court] agree[s] with the defendants or whether the policy in fact advances the . . . legitimate interests.   The only question that we must answer is whether the defendants' judgment was "rational," that is, whether the defendants might reasonably have thought that

---

[13] *See Doc. 63* at 37 ("Fawley must show the differential treatment [under the policies due to his status as a transferee under the ICC] was not reasonably related to a legitimate, penological interest.").

the policy would advance its interests.

*Sperry,* 413 F. App'x at 40 (internal quotations and citations omitted).

Defendants do not offer any affidavit that sets forth the penological purposes of their policies.  Their supplement mentions that, "[c]onsistent with *Bounds/Lewis,* NMCD policy does not require or permit a facility to assist inmates beyond the initial filing stage of a lawsuit."  *Doc. 70* at 2 (¶ 7).  In their reply, Defendants also make this single and incomplete statement – "[a]ffording inmates broad access to authority from other jurisdictions has the potential to overburden the."  *Doc. 73* at 8.  Though this sentence is not complete, the Court understands the rationale Defendants are asserting.

In addition to these two assertions, the preamble[14] and content of the policies, and law as discussed above, demonstrate that the Department has attempted to strike a balance between granting inmate access to the courts in compliance with the current state of the law, without overburdening a facility economically and practically in its day-to-day staff functions.  This sort of interest has long been deemed legitimate.

In *Petrick,* for example, the Tenth Circuit cited *Turner* in connection with the statement that "[a]mong the penological interests that inform our analysis are the financial burden imposed on the prison by accommodating the inmate's constitutional right."  *Petrick v. Maynard,* 11 F.3d 991, 994-95 (10th Cir. 1993) (citing *Turner,* 482 U.S.

---

[14] For example, the stated "purpose" of the Legal Access policy is to "establish rules which will ensure that all inmates have direct access to the courts in **allowable** legal actions."  Legal Access, CD-121000 (preamble, "Purpose" section); *see also id.* (stated "policy" at end of Definition section is that the "Department shall ensure that all inmates have direct access to the courts in all legal claims involving [the three actions identified in definition section]").  Burris believes he is "not allowed to provide inmate with assistance on his Virginia Case" under CD-1001.H.6, and is "not allowed to provide legal access to inmate once their case is filed with the courts except as provided in CD-121001.D (the "Qualified Legal Materials Copying" list); *Doc. 22* at 5-6 (Burris "To Whom It May Concern" Memorandum dated May 31, 2011 "re: informal complaint of inmate . . . Fawley" stating that Burris believes policies comport with *Lewis* and *Bounds*).

at 98).  It also quoted one of its earlier decisions where it stated:  "'Reasonable [prison law library time restrictions] are necessary to balance the rights of prisoners with budgetary considerations.'"  *Id.* (quoting *Twyman v. Crisp,* 584 F.2d 352, 359 (10th Cir. 1978)); *see also Penrod,* 94 F.3d at 1403 ("Considering the security problems at the . . . facility . . . limits on unassigned prisoners' access to the law library were not unreasonable or constitutionally impermissible.").

The most recent Supreme Court decisions discussing *Turner* likewise emphasize a high degree of Court deference to prison management.  *See, e.g., Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington*, ___ S. Ct. ___, ___, 132 S. Ct. 1510, 1515 (2012) ("The difficulties of operating a detention center must not be underestimated by the courts."); *Overton,* 539 U.S. at 133 ("The regulations promote internal security, perhaps the most legitimate of penological goals").

This in no way signals that Defendants should consider themselves excused from complying with their required showing in the future.  However, under the circumstances, the Court does not find it necessary to delay these proceedings again, to require even further supplementation on this point.  The Court finds that because the regulations are plainly designed to mirror binding authority, and do so for the most part, they can hardly be deemed "arbitrary or irrational."  *Shaw,* 532 U.S. at 229.

Also, even if Plaintiff had made an attempt to satisfy his burden, which he has not, the Court would not consider the policies "invalid" after applying the other *Turner* factors under the present state of the law.  The Court finds the reasoning in the *Pierce* case persuasive.  The Ninth Circuit, like the Tenth, places responsibility for "legal materials" on the sending state.  There, the Defendant asserted a number of reasons

justifying the distinction and limitation, including that their policy: "(1) it promotes the safety, security, discipline, and order of NDOC prisons; (2) promotes the ability of out-of-state inmates to obtain out-of-state legal materials from a reliable source; and (3) conserves NDOC's fiscal resources and improves its administrative efficiency." *Pierce v. Skolnik,* No. 3:10–cv–00464–HDM–VPC, 2012 WL 3996850, at *5 (D. Nev. Jun. 19, 2012).  The court applied the *Turner* factors and found the regulation reasonable, in part because:

> First . . . here is a legitimate relationship between the policy and ensuring that out-of-state inmates receive out-of-state law from a reliable source in order to adequately seek legal relief.  There is also a relationship between the policy and conserving NDOC resources because there are many states participating in the Interstate Compact Agreement.  Second, pursuant to NDOC policy, NDOC shall provide an out-of-state inmate with any legal materials sent from the sending state, which allows inmates to receive out-of-state materials.  Additionally, Iowa provides attorneys for inmates (# 36, p. 0127–28).  Thus, there is an alternative means of accessing Iowa law. . . .  Third, the court gives deference to defendant's assertion that it would require NDOC fiscal and administrative resources to ensure that legal materials from many states are available to out-of-state inmates.  Fourth, the court is not aware of a ready alternative.  Accordingly, the court finds that the policy is reasonably related to legitimate governmental interests.  The policy does not violate plaintiff's right to access the courts and is supported by Ninth Circuit precedent as discussed above.

*Id.*

The photocopying policy as written affects inmates based on the amount of money in their accounts, and not on their transfer status.   Nothing in the definition of "qualified legal claims" requires that the habeas suit challenging a conviction be filed in New Mexico, or that a conditions of confinement case for ICC transferees that challenges transferor policies be filed in New Mexico, or that divorce proceedings be

filed in New Mexico.  Nothing on the face of the policy requires that New Mexico

inmates and ICC transferees be treated differently with respect to their out-of-state

suits.  Thus, ICC transferee status is not the basis for distinctions on the face of the

photocopying policy, and that policy cannot be deemed based on a classification that

would receive greater scrutiny than what *Turner* and *Overton* require.  *See, e.g.,*

*Johnson v. California,* 543 U.S. 499, 509-12 (2005) (First Amendment rights under

*Turner* and *Overton* reviewed for reasonableness, while policies based on racial

classifications reviewed under stricter standards).  Because the reason for the cap on

the advance is clearly budgetary, the photocopying advance limitation cannot be

deemed unreasonable under current binding Tenth Circuit authority.

## VI.  Analysis – Supreme Court Petitions For Certiorari

### A.  Supreme Court Denied Certiorari In Two Separate Cases

The Supreme Court Clerk rejected two petitions for certiorari for filing with

instructions to cure certain defects.  *See Doc. 22* at 7-8.  Plaintiff blames these denials

on the photocopying policy.  *See, e.g., Doc. 1* at 12 ("the 'court doors' to the Supreme

Court of the United States are actually shut to this Plaintiff's petition for writ of certiorari

due to prison policies denying access to photocopying and notery (sic) services required

to meet the rules to file"); *Doc. 18* (explaining that he filed the instant action "because

the policy(s) of the New Mexico Department of Corrections obstructed, hindered, and

fully completely denied him the ability to meet the rules to file his appeal in his habeas

corpus proceeding in the U.S. Supreme Court  . . . due [to] his lack of funds, thereby

denying right of court access and access to due process of the law by discrimination

against the poor."); *Doc. 30* at 1-2 ("Plaintiff . . . was denied filing with the U.S. Supreme Court, due [to] his lack of available funds").

Defendants contend in their *Martinez* Report that Plaintiff did not fully exhaust his administrative remedies on one of the grievances concerning this claim and, alternatively, that Plaintiff cannot satisfy the actual injury requirement because the underlying suit was frivolous.  *See Doc. 63* at 17-23.  This argument assumes that both petitions applied to the same suit, and that the suit was a § 1983 suit brought in federal court in Virginia.  *See id.* at 17, n.5, 19.  However, Plaintiff's allegations about the Supreme Court certiorari proceedings have encompassed two separate petitions for certiorari from the outset of this action – "the first petition or writ of certiorari regarded issue of habeas corpus litigation, the second petition regards issue of a civil rights action."  *Doc. 1* at 6; *see also Doc. 22* at 7-8.  One of his *Martinez* Report responses specifies that he suffered actual injury in both instances when he attempted to appeal "#2:09-cv-542/#2010 WL 3476450" and "#2:10-cv-175/#2010 WL 3521960."  *Doc. 71* at 2; *see also Doc. 63-10* at 4 (grievance notes that "to accompany my initial filing with the U.S. Supreme Court in connection with my habeas corpus proceeding").

The Court thus concludes Plaintiff's first petition attempted to appeal the Fourth Circuit's decision concerning his untimely federal habeas action, and the second attempted to appeal the Fourth Circuit's decision concerning his § 1983 action that failed to state a claim on screening review.  In addition to Plaintiff's identification of these as the two cases by number, the timing of the decisions and Clerk letters supports the same conclusion.[15]

---

[15]  Plaintiff's first petition for certiorari was postmarked January 3, 2011, and was received by the Supreme Court on January 14, 2011.  *See Doc. 22* at 7.  The Fourth Circuit's decision in No.

Defendants briefly address the habeas action in their reply by reference to their

*Martinez* Report argument.  Thus, they also evidently also maintain that Plaintiff did not

fully exhaust for the purposes of either petition.  *See Doc. 73* at 2-3.  For their

---

10-6896 was the appeal from the decision of the Eastern District of Virginia that dismissed Plaintiff's § 2254 petition as untimely.  Although noting Plaintiff had pursued three state petitions for habeas relief, the district court concluded Plaintiff's conviction became final for the purposes of the federal one-year statute of limitations in September 2006 when he failed to appeal his conviction, and yet did not file his federal petition until August 31, 2009.  The district court was aware Plaintiff had been transferred to New Mexico several months before he filed the last of his state petitions and his federal petition, but found basis for equitable tolling because Plaintiff did not raise any such grounds in his pleadings or objections.  *See Fawley v. Johnson,* No. 2:09cv452, 2010 WL 2483904, at **1-2 (E.D. Va. Apr. 13, 2010), *report and recommendation adopted by* 2010 WL 2483988, at *1 (E.D. Va. Jun. 16, 2010).  The Fourth Circuit dismissed the appeal on September 7, 2010, and denied Plaintiff's petition for rehearing on October 19, 2010.  *See Fawley v. Johnson,* 395 F. App'x 63 (4th Cir. 2010) (the decision issued in No. 10-6896 on September 7, 2010, bearing Westlaw number of 2010 WL 3476450); *see also Fawley v. Johnson,* No. 10-6896 (docket and Doc. 23).  The February 7, 2011 letter from Clerk returned the petition because (a) Plaintiff did not submit a "notarized affidavit or declaration of indigency," and supplied a form for the same, and (b) his appendix "did not contain" copies of the "lower court opinion," which is necessary to determine the timeliness of the petition.  The Clerk gave Plaintiff 60 days to cure the defects.  *Doc. 22* at 7.

Plaintiff's second petition could not have been an attempt to cure the first one, given that his second petition for certiorari was postmarked February 3, 2011 and the date of the Supreme Court's first letter was February 7, 2011).  *See Doc. 22* at 8.  This petition sought certiorari from the Fourth Circuit's conclusion in No. 10-6930.  That case involved an appeal from the decision of the Eastern District of Virginia that dismissed his § 1983 complaint alleging that the grand jury improperly indicted him and the trial court held a hearing outside of his presence.  Plaintiff filed that action on April 15, 2010, a year after he was transferred to New Mexico.  He alleged that "his rights were violated in 2006 because he was not indicted properly by a grand jury and because a hearing was held without him being present."  *Fawley v. Johnson,* Action No. 2:10cv175, 2010 WL 6797327, at *1  (E.D. Va. Jun. 23, 2010).  He named as defendants the defense attorneys, prosecutors, and the judge from the criminal proceedings that led to his conviction.  *See id.,* at **1-2; *see also Fawley v. Johnson,* Action No. 2:10cv175-MSD-FBS (Doc. 1).  The district court dismissed at the screening stage on because none of the defendants could be liable under § 1983 due to lack of state action or absolute immunity, and because his suit was some two years beyond the statute of limitations.  *See Fawley v. Johnson,* 2010 WL at **1-2.  The Fourth Circuit found no error and affirmed for the same reasons on September 7, 2010, and denied Plaintiff's petition for rehearing on November 11, 2010.  *See Fawley v. Johnson,* 395 F. App'x 64 (4th Cir. 2010) (the decision issued in No. 10-6930 also on September 7, 2010, bearing Westlaw number 2010 WL 3521960); *see also Fawley v. Johnson,* No. 10-6930 (docket and Doc. 18).  The February 18, 2011 letter from the Clerk returned the petition for the same reasons as the first – Plaintiff did not submit a "notarized affidavit or declaration of indigency" (form supplied) and his appendix "did not contain" copies of the "lower court opinion" – and again gave Plaintiff 60 days to cure.  *Doc. 22* at 8-9.

exhaustion argument, they identify grievances submitted in Judge Black's case. *See Doc. 63* at 17-18.

### B. At Most, Plaintiff Only Exhausted The Habeas Certiorari Petition

Plaintiff began the grievance process before he mailed his first petition. On November 29, 2010, he requested "copies of appendix(s) (sic) for writ of certiorari to U.S. Supreme Court." *Fawley v. Williams,* CIV 11-0061 BB-CG (Doc. 34-18 at 3). Defendant Burris denied the request that same day because Plaintiff "ha[d] insufficient funds for more copies." *Id.* The matter could not be resolved at the informal complaint stage as of December 7, 2010, *see Doc. 63-10* at 1, and proceeded to the formal grievance level on December 15, 2010, *see id.* at 4.

Plaintiff did not wait for a response before mailing his first petition, which the Clerk of the Supreme Court noted "was postmarked January 3, 2011." *Doc. 22* at 8. Plaintiff, in fact, could have waited. If he was calculating his ninety-day period from September 7, 2010, he was mistaken, since his timely-filed petition for rehearing in the Fourth Circuit did not make its decision "'genuinely final'" until October 19, 2010, when it denied rehearing on for some reason other than timeliness. *Limtico v. Camacho,* 539 U.S. 48, 487 (2007) (quoting *Hobbs v. Winn,* 542 U.S. 88 (2004)); *see also Fawley v. Johnson,* No. 10-6896 (docket and Doc. 23) ("The Court denies the petition for rehearing and rehearing en banc. No judge requested a poll under Fed. R. App. P. 35 on the petition for rehearing en banc.").

In early January, the formal grievance was denied because he would exceed the photocopying $300 limit by $26.26. *See Doc. 63-10* at 5. On further appeal the Deputy Director considered Plaintiff well-versed in the policies given prior grievances and that

his "claim that the New Mexico Corrections Department is denying you photocopying services is false.  You are being given the right to have photocopies made but you refuse to pay for the copies you want made."  *Id.* at 6.

Meanwhile, on Christmas 2010, Plaintiff requested "copies of a legal document and exhibits, ***regarding case 2:10-cv-175, a civil rights action,*** to submit as per Rule 29 of the U.S. Supreme Court, [a] protected legal action for right of court access." *Fawley v. Williams,* CIV 11-0061 BB-CG (Doc. 34-18 at 2).  On January 1, 2011 Burris "e-mailed inmate accounts."  *Id.*  On January 10, 2011, after a delay due to a lockdown, Burris denied the request due to "insufficient funds."  The record does not reflect that he filed an informal or formal grievance over this denial.

Instead, his next request appears on January 18, 2011, when Plaintiff asked for "black ink pen & paper to draft copies, of a  "23 page writ of certiorari[i]  - 3 required copies – regarding civil rights action. . . also copies of required appendixes (sic), required by U.S. Sup. Ct. Rules to accompany 4 copies of writ."  *Id.* at 1.   This request does not explain whether it pertains to his two previously denied requests for photocopying, or whether the petition for certiorari relates to a different case.  Defendant Burris disapproved the request on January 19, 2011 because Plaintiff's "complaint did not involve a qualified legal claim," but did not explain why.  *Id.*

The grievance lieutenant's affidavit provides that, based on her review of the records, Plaintiff did not file a formal or informal grievance with respect to the pens and paper.  *See Doc. 63-9* at 16 (¶13.b.).  Defendants thus consider the claim unexhausted, and the Court agrees.  *See Doc. 63* at 21.  If the "pen and "paper" request applies only to the civil rights certiorari petition, Plaintiff wholly bypassed the grievance process for

this claim, and it can be dismissed on that basis alone.  If it is construed as a serial request that covered both the habeas and civil rights claims, then both are unexhausted and can be dismissed as such.  *See, e.g., Mitchell,* 489 F. App'x at 260 ("Although the record indicates that Mitchell initiated the administrative remedy process on at least two occasions (once before filing his complaint and once after), the record also indicates that he failed to fully exhaust the remedies available to him.  Thus, the district court was required under the PLRA to dismiss his complaint.").

Nothing in the record shows that Plaintiff ever requested, was denied, or grieved notary services in connection with his certiorari petitions.  Thus, Plaintiff's assertion that application of prison policies denied him "access to . . . notery (sic) services" does not bear out with relationship to the certiorari petitions, and any such claim is also unexhausted.  *Doc. 1* at 12.

### C. Alternatively, Though Access Was Impeded, Plaintiff Was Not Denied "Meaningful" Access In The Constitutional Sense

The Supreme Court had given Plaintiff extensions in both instances to approximately mid-April.  The only thing that precluded Plaintiff from curing the impediment to his petitions for certiorari were two copies of the pauper form the Supreme Court sent him, no doubt a form of less than five pages,[16] copies of the Fourth Circuit's one-to-two page orders from which Plaintiff wanted to appeal, and some extra postage.[17]

---

[16] *See* SUP. CT. R. 39.1 ("A party seeking to proceed *in forma pauperis* shall file a motion for leave to do so, together with the party's notarized affidavit or declaration (in compliance with 28 U. S. C. § 1746) in the form prescribed by the Federal Rules of Appellate Procedure, Form 4.  The motion shall state whether leave to proceed in forma pauperis was sought in any other court and, if so, whether leave was granted.").

[17] Whereas other in forma pauperis litigants must file ten copies each of their pauper motion and

Defendants assert that Plaintiff in fact had plenty of paper and pens at his disposal to accomplish this, as evidenced by his many handwritten filings during this time frame, and Plaintiff does not argue otherwise.  On one hand, requiring an inmate to duplicate court forms and court orders by hand when an overage is a mere $26 seems under these circumstances unreasonable, and just invites shenanigans and more work for Defendant's counsel and the courts to verify the handwritten submission is accurate. Nevertheless, nothing in the record establishes that Plaintiff told any Defendant or those involved with the appeal (or that they independently knew), of the time frame or relatively few pages of copying at issue.

On the other hand, though Defendants and Plaintiff also do not discuss the circumstances surrounding the flow of funds through Plaintiff's account, likely he would have somehow amassed the funds necessary to pay off the arrearage and cover the copies.  By June of 2011, for example, this Court noted the $350 filing fee as paid.  *See Doc. 20.*  A month later, the Western District of Virginia noted the same thing.  *Fawley v. Johnson,* Civil Action No. 7:09-cv-0041-JLK (docket entry 7/5/11).  On this record, it therefore appears then that "[a]t worst, defendants' misconduct temporarily, but not fatally," would have "delayed, and . . . not unreasonably hinder[ed], the filing of" Plaintiff's petitions for certiorari.  *Purkey v. Green,* 28 F. App'x 736, 742 (10th Cir. 2001).

Moreover, Plaintiff clearly considers the mere inability to file his petitions for certiorari as proof of actual injury sufficient to support a denial of "meaningful" access to the courts.  *See, e.g., Doc. 71* at 8.  As discussed at the outset, however, the Supreme Court considers the underlying suit and the actual injury inquiry inseparable and related

---

petition for certiorari, inmates who proceed in forma pauperis need file only an original petition and motion..  *See id.,* R.12.2; id., R.39.2.  The appendix to the petition can be more lengthy, *see id.* R.14.1(g),(f), (i), but the Supreme Court Clerk did not find the petition wanting in that respect.

to whether "meaningful" access was denied.  *See also, e.g., Williams v. Mestas,* 355 F. App'x 222, 224-25 (10th Cir. 2009) (same); *c.f. Harrison,* 24 F. App'x at 967 ("It is not enough [to state a claim] for Mr. Harrison to state that he is unable to file motions or briefs.").

Plaintiff's only argument for why certiorari in his habeas suit was not frivolous is because he raised underlying constitutional issues that he believes were meritorious. *See Doc. 76* at 4.  This argument wholly ignores that the suit was dismissed on statute of limitations grounds because the limitations period had expired long before Virginia transferred Plaintiff to New Mexico with no allegation or showing of any grounds for equitable tolling.  *See, e.g., supra* note 15.  It also ignores the reality that Rule 10 of the Rules of The Supreme Court of the United States (Adopted 1/12/10, effective 2/16/10), states a "petition for writ of certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law." Sᴜᴘ. Cᴛ. R. 10.

Plaintiff does not even posit that he had a "hope" of securing certiorari for his civil rights claim, which challenged his criminal trial procedures civilly after years of unsuccessful pursuit of state habeas relief, and was dismissed at screening stage because the attorneys he sued could not be held liable and because the statute of limitations had run.  *See, e.g., supra* note *15; see also Fawley v. Johnson,* 7:09–cv–0041, 2011 WL 3240537 (W.D. Va. Jul. 28, 2011) (comprehensive discussion of state habeas proceedings).

# VII.  Analysis – Coram Nobis & Mandamus In Virginia State Court

The writs of "coram nobis" to the Mathews County Court and mandamus to the Virginia Supreme Court Plaintiff filings are related.  They are state counterparts to the claims Plaintiff attempted to pursue in the Western District of Virginia civil rights action above regarding allegations of misconduct by attorneys and the judge in his criminal proceeding.  *See supra* note 15.

### A.  Chronology Of Background Events

Plaintiff made his initial request in October 2010 when he asked for "help in initial filing of writ of error (appeal) . . . how to draft a writ of error – proper form," in the form of a "[m]eeting with paralegal."  *See Fawley v. Williams, et al.,* CIV 11-0061 BB-CG (Doc. 34-18 at 5).  Defendant Burris "[a]pproved" Plaintiff's request, and the details of whatever took place immediately thereafter as a result of the approval are not set out.

The record does reveal, however, that Plaintiff was aware of the Department's position against copying out-of-state materials, and his need to go elsewhere to obtain them.  For example, on February 17, 2011, Plaintiff wrote the Mathews County Circuit Court Clerk and asked for "copies of records."  *Doc. 26.* at 16.  Although the Clerk apparently had provided copies in the past, as of March 10, 2011, that court signaled it would not entertain any more such requests:

> I am in receipt of your letter of February 17, 2011 requesting copies of records.
>
> I have discussed this with Judge Long and he advised me to write you and tell you as follows.
>
> Please be advised that your cases have ended and I do not have time to keep sending you copies.  Do not correspond with me anymore.

> If you have any other questions or request, you should be in
> touch with your attorneys.

*Id.*

Nevertheless, as Plaintiff would later assert in his writ of mandamus, on April 6, 2011, he "filed by U.S. Mail" a motion entitled "Fraud, Mistakes & Inadvertence Upon Court." *Doc. 26* at 17.

On May 25, 2011, Plaintiff requested copies of his "consolidated motion for writ of error coram nobis and fraud upon the court to contest my conviction and sentence . . . denied me through judicial misconduct, an ex parte hearing, and fraud upon the court." *Doc. 63-5* at 9. Copies of the motion were destined for filing in the Mathews County Circuit Court in Virginia and the Virginia Supreme Court. *See id.* at 11-21. Burris "disapproved" the request on May 26, 2011, because it did not a "qualified legal claim." *Id.* at 5.

By a Memorandum dated May 26, 2011, from Defendant Burris to Plaintiff, Burris again explained that when the materials Plaintiff prepared and wants copied are destined for an out-of-state court other than the Tenth Circuit or Supreme Court, "we do not provide service." *Doc. 22* at 10. Burris thus, "ha[d] no choice but to deny [Plaintiff's] copy request. *Id.* at 11. In a Memorandum dated May 31, 2011, from Defendant Burris to "Whom It May Concern," "re: informal complaint of inmate . . . Fawley," that concerns the Western District of Virginia civil rights action, Burris again reiterates the Department's position and signals that he did not necessarily agree with it  – "I am not allowed to provide inmate with assistance on his Virginia Case . . . [u]nfortunately, I cannot change the policy . . . therefore, my recommendation is for Inmate Fawley to

Case 2:11-cv-00181-LH-KBM   Document 98   Filed 03/18/13   Page 47 of 54

proceed thorough the grievance process so he can attempt to have these provisions reconsidered by the appropriate courts and agencies." *Doc. 22* at 5-6.[18]

The denial sparked the motion to amend here, which Petitioner signed on June 20, 2011, but it did not deter him from sending filings to the Virginia courts.   For example, sometime before the latter part of June, Plaintiff sent his coram nobis filing to the Mathews County Circuit Court.  He would later state that he "did file, by registered mail . . . on June 20, 2011," a "consolidated motion of coram nobis and fraud upon the court." *Doc. 26* at 10.  On June 23, 2011, Plaintiff wrote the Clerk, asking "what became of a motion I filed (mailed to your office, to be filed). *Id.* at 13.  He "need[ed] to know if you are going to file these or refuse to do so." *Id.*  Plaintiff also noted that "you refused to provide me, a pro se petitioner, access to court records my former counsel could not provide me." *Id.*  On July 1, 2011, he wrote the clerk again, asking for the "court docket number assigned to the [coram nobis] motion I mailed to the court, by registered mail, 20 June 2011." *Id.* at 14.

The denial also did not dissuade Plaintiff from sending a mandamus petition to Virginia Supreme Court, complaining that the Mathews County Circuit Court did not send him notice of the coram nobis motion he filed. *Id.* at 10.  The petition he claims he "filed 27 June 2011," id. at 7, asked the Virginia Supreme Court to "force Mathews County Circuit Court to inform [him] of the court docket number for [his April fraud motion and June coram nobis motion]," *id.* at 17.  By letter dated July 5, 2011, the clerk returned the petition because it had "the following [three] problems:"  (1) Plaintiff did not

---

[18] Defendants also submitted the former memorandum, but not the latter. *See Doc. 63-11* at 11-12.  However, they do challenge the authenticity of the later memorandum, and in fact cite these submissions by Plaintiff in connection with these claims. *See Doc. 63* at 21-24 (citing *Docs. 22, 26*).

-47-

identify a proper respondent, *id.* at 8; (2) he did not have the petition notarized, so the

Clerk sent him a verification form, *id.* at 8-9; and (3) Plaintiff did not pay the $50 filing

fee, *id.* at 8.

On July 13, 2011, Plaintiff requested copies of motions destined for Virginia for

the "production of court documents to obtain evidence of fraud upon the court."  *Id.* at 6.

That same day Plaintiff wrote to the Clerk of the Supreme Court of Virginia explaining

that he does not have notary services available to him that that the same caused his

June 27th writ to be "denied, in part, due to having no access to notery (sic) services."

*Id.* at 7 (internal quotations omitted).  He cited this lawsuit as his effort to "remove these

obstructions" but warned that it "may take years."

On July 17, 2011, Defendant Burris again disapproved the request because it did

not involve a qualified legal claim.  *See id.* at 6.  Plaintiff had been advised that Burris

"cannot photocopy documents to be filed in other states" and that "[t]hese instructions

come from . . . legal access monitor [Wiggins]."  *Id.* at 4.  Plaintiff had also been advised

"of alternative methods to obtain copies including requesting copies from the Court you

file your documents in or requesting copies from the agency that provides your legal

access from Virginia [or submit them to family or friends to have them copied."  *Id.*[19]

### B.  Failure To Exhaust By Not Fully Completing Grievance Process

Defendants argue that the coram nobis and mandamus matters were not

exhausted to completion.  They assert that, although Plaintiff began the informal

---

[19] Nevertheless, Plaintiff had "repeatedly objected to the procedure to have documents copied" and gave Burris his "documents for copying and leaving them until we have been comp[letely] paid."  *Id.* at 4-5.  At the same time, Plaintiff insisted that because he was "trying to add [Burris] as a defendant in your civil action," Burris "should not have access to [Plaintiff's] legal documents outside [his] presence."  *Id.* at 5.  Thus, Burris noted that "[h]aving copies made through your state[']s legal access officer or through the Court would resolve this issue too."  *Id.*

grievance process with respect to the coram nobis petition, he prematurely filed his motion to amend before pursuing a formal grievance, and he never completed the process by appealing to the Secretary.  *See Doc. 63* at 24.   The affidavit of the grievance lieutenant does not entirely bear out their position.  It states that:

> Fawley filed an inmate Informal Complaint against Mr. Burris arising form the denial of photocopies for his petition for writ of error on June 1, 2011.   Fawley submitted a formal Grievance regarding the matter on July 1, 2011.   Fawley appealed the issue to the Secretary of Corrections on August 23, 2011.   The grievance packed for this issue is attached Exhibit J-5 to the Joint Martinez Report.

*Doc. 63-9* at 17 (¶ 13.e).  Those records show that the formal grievance was denied "because reasonable alternatives are available, including but not limited to requesting copies from the Court you are fining (sic) in or requesting copies form the legal Access Department of Virginia.   *Doc. 63-11* at 18.  The Director agreed for the same reasons. *See id.* at 19 ("You do have other options to obtain copies").

Nonetheless, it is clear in this Circuit that "'[a]n inmate who begins the grievance process but does not complete it is barred from pursuing a [federal] claim under the PLRA for failure to exhaust his administrative remedies.'"  *Fields v. Oklahoma State Penitentiary,* 511 F.3d 1109, 1112 (10th Cir. 2007) (quoting *Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir. 2002); *see also Snyder v. Harris,* 406 F. App'x 313, 317 (10th Cir. 2011) ("Mr. Snyder filed this lawsuit on May 14, 2007, before the grievance officer received his Step 3 grievance.  An inmate is not permitted to complete the administrative exhaustion process after he files suit.") (citing *Johnson v. Jones,* 340 F.3d 624, 627 (8th Cir. 2003)).  Plaintiff filed his motion to amend in late June, but did not begin the formal grievance process until early July.  Accordingly, the coram nobis

matter was not fully exhaust at the time he filed his motion, and it can be denied on that basis.  *See McMillan v. Delarosa,* Civil Action No. 6:11cv292, 2012 WL 3044316, at * 2 (E.D. Tex. Jul. 24, 2012) ("the fact that McMillan's Step Two grievance was pending as of the filing of the amended complaint shows that he had not completed both steps of the administrative grievance procedure prior to filing suit").

Defendants also argue that, although Plaintiff began the informal grievance process with respect to the mandamus petition, he never followed with a formal grievance.  *See Doc. 63* at 22-24.  The grievance lieutenant's affidavit does establish this, and Plaintiff does not argue otherwise.  *See Doc. 63-9* at 16-17 (¶13.c-d). Accordingly, one basis to dismiss the mandamus action is failure to exhaust.

### C. Alternatively, Though Access Was Impeded, Plaintiff Was Not Denied "Meaningful" Access In The Constitutional Sense

The state of the policies left them subject to interpretation because they do not do not spell out with precision the interplay between the legal access policy (that restricts active assistance for transferee inmates) and the photocopying policy (that imposes no such restrictions when the prisoner has the item to copy in his possession). Nor do they expressly consider appellate matters.  Thus, they are subject to interpretation.  As such, nothing in this record demonstrates Defendant Wiggin's construction of them was the result of an animosity directed toward Plaintiff personally or toward his status as a transferee.

In the Court's view, Wiggins' interpretation of the photocopying policy was overbroad.  To disallow any in-hand **copies** destined out of state except for the Tenth Circuit and the Supreme Court seems to fly directly in the face of the plain language of the policy, provided the lawsuit qualifies.  Coram nobis "by its nature seeks

postconviction review" so these proceedings arguably fall within the definition of "qualified legal claim."  *United States v. Denedo,* 556 U.S. 904, 921 (2009).  Indeed, because the plain language of the policy does not distinguish between New Mexico and ICC inmates who have filings they prepared and ready to copy, in part is what renders it "reasonable" under the *Turner* analysis, above.  Even if the Court concluded that Defendants violated its own policy, that fact alone affords Plaintiff no basis for relief under § 1983.  *See, e.g., Barrett v. Orman,* 373 F. App'x 823, 825 (10ᵗʰ Cir. 2010) ("a violation of a prison regulation is not automatically a constitutional violation") (citing *Gaines v. Stenseng,* 292 F.3d 1222, 1225 (10ᵗʰ Cir. 2002)).

Moreover, as with the Supreme Court petitions above, the only thing standing between Plaintiff filing the mandamus action was to name a proper defendant, tender the fee, and submit a notarized affidavit.  Nowhere does the record show that he made any effort in New Mexico to secure a notarization, and grieve that if it had been denied, or that he made any alternative efforts to secure it from Virginia avenues.  Again then, on this record, it therefore appears that "[a]t worst, defendants' misconduct temporarily, but not fatally," would have "delayed, and . . . not unreasonably hinder[ed], the filing of" Plaintiff's mandamus petition.  *Purkey,* 28 F. App'x at 742.  Because the mandamus petition was integrally-related to being able to pursue the coram nobis action, the Court cannot overlook Plaintiff's own actions as a contributing factor to his evidently unsuccessful coram nobis action.

This Court has not been able to precisely ascertain what became of the April "fraud" and June "coram nobis" submissions to the Mathews County Circuit Court.[20]  For

---

[20] A search of that court's case records only shows Plaintiff's criminal case.  *See* http://wasdmz2.courts.state.va.us/CJISWeb.  The Court cannot consider this result

the purposes of argument, he Court will assume that the coram nobis action never launched.  The Court also agrees that this last-ditch effort to obtain relief from his conviction simply reiterated what the various courts had entertained and rejected in the past.  *See Doc. 63* at 24.

The "consolidated motion for a writ of error coram nobis and fraud upon the court," stripped of all of the surplusage, alleges that the Virginia Supreme Court did not base its decision on direct review on a "verbatim transcript" of the "complete record of criminal proceedings."  And, if it had, the court would have known the trial judge failed to provide notice of a hearing to defense counsel and held the same ex parte, thereby demonstrating his bias.  Plaintiff claims this denied due process, and the appellate courts should have addressed it.  *See Doc. 63-5* at 11-19.  The Western District of Virginia decision has already held that these sorts of claims do not establish a denial of access to the courts:

> The additional claims plaintiff intended to argue on habeas review also had no chance of success.  Plaintiff argues that he would have raised the following claims in his state habeas petition if he had reasonable access to courts: his guilty plea was involuntary because defense counsel withheld information leading to a possible defense; counsel or the prosecutor unlawfully withheld DNA tests and misleadingly proffered evidence as blood stains; the indictment was invalid; counsel failed to file a notice of appeal or represent plaintiff at a post-trial hearing; and the circuit court failed to advise plaintiff of the disposition of his non-attorney's post-trial motion.  ***However, the Supreme Court of Virginia already determined that plaintiff's plea was knowing and voluntary; counsel were not ineffective for failing to note an appeal; and that his***

---

comprehensive due to the Western District of Virginia's discussion of Fawley's two post-conviction proceedings with the circuit court.  *See Fawley v. Johnson,* 7:09–cv–0041, 2011 WL 3240537, at **2 (W.D. Va. Jul. 28, 2011) (citing "*Fawley v. Commonwealth,* No. CL08000069–00 (Cir. Ct. Mathews Co. Dec. 4, 2008): and "*Fawley v.* Va. Dep't of Corr., No. CL09000056–00 (Cir. Ct. Mathews Co. Oct. 9, 2009)").

> **knowing and voluntary guilty plea waived all nonjurisdictional defenses available prior to his guilty plea.** Furthermore, the non-attorney's filing had no legal effect. . . . **Thus, all of these claims plaintiff says he would have brought had no chance of success on habeas review, as already determined by the Supreme Court of Virginia.**
>
> In conclusion, the claims plaintiff says he would have raised on both direct appeal and on state habeas, if it were not for the allegedly deficient access to courts provided by PCC and KMCC staff, would not have entitled plaintiff to his requested relief. Therefore, the allegedly prevented claims had no reasonable chance of success and were based merely on hope. Accordingly, plaintiff fails to establish a denial of reasonable access to courts.

*Fawley v. Johnson,* 7:09–cv–0041, 2011 WL 3240537, at **14-15 (W.D. Va. Jul. 28, 2011) (emphasis added). The Fourth Circuit affirmed. *See Fawley v. Johnson,* No. 11-7147, 2012 WL 540829 (4th Cir. Feb. 21, 2012).

The same rationale is equally applicable here. Consequently his access to the court claim is without merit.

## VIII. Analysis – Miscellaneous

As for the legal mail claim, *see Doc. 47* at 3-4, the Court appreciates the clarification and briefing on the subject by Defendants, and incorporates it herein as the findings of the Court. *See Doc. 63* at 28. The Court further incorporates and adopts all of Defendants' alternative positions set forth in the *Martinez* Report. *See id.* at 29-41.

To the extent that Plaintiff's various pleadings, both pre-*Martinez* Report briefing and post-*Martinez* Report briefing bring additional claims beyond those already addressed, the Court has not permitted any such amendment, and they are denied without prejudice.

Wherefore,

**IT IS HEREBY RECOMMENDED AS FOLLOWS:**

1. Plaintiff is notified that the he has accumulated two strikes within the meaning of 28 U.S.C. § 1915(g);

2. Plaintiff shall desist from making serial and duplicative filings in this case and shall make other filings legible; failure to do so can result in sanctions;

3. Plaintiff's access to the courts' claims are unexhausted and/or without merit;

4. Plaintiff's legal access claim is without merit;

5. Plaintiff is not permitted to amend to bring claims in this suit beyond those already addressed and rejected;

6. All pending motions by Plaintiff be denied (*see* Docs. 57, 58, 69, 75, 76, 79, 81); and

7. Summary judgment be granted in favor of Defendants, and his action be dismissed with prejudice.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

UNITED STATES CHIEF MAGISTRATE JUDGE